511 A.2d 567

**Gary Donald REED**

v.

**STATE of Maryland.**

**No. 1523, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

July 10, 1986.

Certiorari Denied Nov. 5, 1986.

Arthur A. DeLano, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Ronald M. Levitan, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, and J. Donald Braden, State's Atty., for Queen Anne's County on brief, Centreville), for appellee.

Argued before WEANT, KARWACKI and WENNER, JJ.

KARWACKI, Judge.

Gary Donald Reed, the appellant, was convicted by a jury in the Circuit Court for Queen Anne's County of the second degree murder of James Bardy Middleton, use of a handgun in the commission of a crime of violence, and transporting a handgun. He was sentenced to consecutive terms of twenty-five years (with ten years suspended) for second degree murder and ten years (with five years suspended) for use of a handgun. A concurrent three year term was imposed on the handgun transportation count. This appeal followed.

### The Facts

On January 5, 1985, between 11:00 and 11:15 a.m., the appellant shot and killed James Bardy Middleton at an isolated point along the Hope-Ruthsburg Road. There were no eyewitnesses to this homicide.

Shortly before the shooting, the appellant and Middleton were seen by several witnesses, in front of the Ruthsburg Store, having a conversation. There was evidence that Middleton had borne a grudge against the appellant since the preceding spring, when the appellant testified as a State's witness in a criminal prosecution of Middleton. Middleton had been convicted and sentenced in that case. The appellant testified that after that trial Middleton told him that "he would regret that day." Middleton's girl friend, Melissa Walls, testified that the appellant "had caused Bardy legal problems, because he went to court and lied and went to court and said something happened that didn't actually happen, and Bardy got two years out of it, 18 months suspended and probation, and naturally he would have hard feelings with him for that."

Several witnesses corroborated the appellant's testimony concerning Middleton's threatening behavior prior to January 5, 1985.

The only direct evidence of what occurred after the appellant and Middleton drove away from the Ruthsburg Store was furnished by the appellant. He testified that after Middleton followed him for a short time Middleton passed the appellant's car, pulled to the side of the road, and got out of his truck. When the appellant drove past, Middleton immediately re-entered his truck and again followed the appellant. He soon caught up to the appellant's car, passed it, and brought his truck to a stop, blocking the appellant's way.

The appellant then testified that Middleton ran up to the driver's side of his car and yanked open the door. Then he grabbed the appellant by his hair, pulled him out of the car, and began beating the appellant's head against the side of the car. The appellant explained that he then reached into his car, "groping for anything I could get a hold of, and I got a hold of the gun. ... I hit Bardy on the head with it trying to get him off." The appellant's testimony continued:

A. I thought he was going to stop. I thought he would quit. I knew he had to see the gun. He had to. He just got up off his knee, shook his head and started to run at me.

Q. All right. What, if anything, did you do?

A. I raised the gun and shot in his shoulder, his arm.

Q. Did you fire any further shots at that time?

A. This side. No, I didn't. I stop shooting. Bardy, when the shot hit him, Bardy spun around towards the middle of the road. My car was south of his truck.

Q. How close was he to you?

A. Approximately the same distance, maybe eight feet. He put his hand to the gun shot where I guess it hit

him and he looked at his hand, and it was a split second thing, I mean it wasn't like no five minutes he looked or nothing, and he touched it and looked, and I mean he, to me, to ask me, he was like a crazy man. He clenched his hands like that and just started at me.

Q. At what position were you at that time?

A. I was still sitting on the ground.

Q. Did you feel that you could have gotten away at that time?

A. No. It all happened in split seconds. The whole thing was probably over in a matter of not a minute maybe, a minute and a half. It was all simultaneous.

Q. Okay. He then, you said, clenched his fist and became angry, and you said he started to run at you.

A. He come at me. I was scared. He come at me. He screamed, he hollered. Not like a wounded scream, but just a crazy, just like he wanted to get a hold of me. I raised the gun again at the upper part of his legs. He still kept coming.

Q. Did you fire any shots then?

MR. BRADEN [State's Attorney]: Objection.

\* \* \* \* \* \*

THE WITNESS: When I raised the gun up again, simultaneous as I raised, and I was aiming at the upper part of his legs. As I raised the gun, Bardy ducked, but he still was approaching me. I fired two shots, one behind the other. Bardy fell. He just laid there.

The appellant left his victim lying in the roadway where he had fallen, got into his car, and drove to his home in Centreville. On the way, he threw the gun that he had used to kill Middleton into a branch under a bridge on the road.

In seeking reversal of the judgments below, the appellant complains that:

I. The court abused its discretion in refusing to grant a mistrial following an improper comment upon appellant's post-arrest silence;

II. The court erred in admitting evidence of other crimes; and

III. The evidence was insufficient to sustain the appellant's convictions.

We find no merit in any of these arguments and affirm the judgments appealed from for the reasons we now explain.

## I. *Mistrial*

At 11:30 a.m. on January 5, 1985, Corporal Ronald F. Russum of the Maryland State Police was summoned to the scene of this homicide where he found Middleton's body laying in the roadway. His investigation of the circumstances surrounding Middleton's death quickly developed probable cause for the belief that the appellant had fired the fatal shots. At 3:00 p.m., he arrested the appellant at his residence.

Corporal Russum testified that after he advised the appellant that he was a suspect in the Middleton homicide, he read him his *Miranda* rights. Corporal Russum continued:

After I placed him in the police vehicle he stated he had not seen Bardy Middleton. He then said he was in Easton taking an air force exam at 10:45 a.m.

Personal observation of Mr. Reed. I observed marks and abrasions on his head and face. I asked him how those came about. And he indicated that he and his brother-in-law fought about the rent he had not paid.

By this time we were going down the road heading towards Ruthsburg. I then pulled into Ruthsburg/Hope Road and stopped. And then he indicated he did see Middleton but he did not follow him anywhere.

He stated Middleton was parked across the street from the store and when he left the store, referring to himself, he went down toward Hope to where he has a junk car. He then stated I didn't see Middleton on that road. He

also stated I have not seen Middleton since he was arrested.

The appellant made no further pretrial statements to the Maryland State Police or to any other State agency. At his trial the appellant admitted that he fired the shots which killed Middleton, but justified his actions on the ground of self-defense. During his cross-examination the State's Attorney inquired:

Q. Were you telling Corporal Russum the truth when you told him that you had not seen Bardy Middleton since the time that he was arrested back in the summer?

A. No, I lied to Mr. Russum. I told him I didn't see Bardy because I didn't want to put myself in the place of being anywhere around him because of knowing what had happened.

Q. You didn't want to be charged with any crime as a result of that incident, is that right?

A. I was scared, yes.

Q. Mr. Reed, according to my calculations there have been 200 days that have passed between the 5th of January and today. Why not on any of those days did you come forward and say something different?

MS. [sic] PODOLAK [Defense Counsel]: Objection. I ask for mistrial now. He knows better than that.

The court sustained defense counsel's objection but declined to declare a mistrial.

The appellant's argument that this constituted reversible error is structured on the premise that the State's Attorney's inquiry into his prior inconsistent statement as to his involvement in Middleton's shooting violated his right to remain silent guaranteed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He posits that notwithstanding the court's agreement with his objection to the question, the mere mention of his prior statement and its inconsistency with his trial testimony was so prejudicial

to his defense as to mandate a mistrial under the analysis proposed in *Wilhelm v. State*, 272 Md. 404, 416, 326 A.2d 707 (1974), and *Curry v. State*, 60 Md.App. 171, 180, 481 A.2d 812 (1984). The cornerstone of the appellant's thesis, however, is flawed since the prosecutor's inquiry into the appellant's prior inconsistent statements as to his involvement in the Middleton homicide was legitimate.

■ It is well settled that the credibility of the trial testimony of a witness, whether or not a party litigant, may always be challenged by confronting him with prior extra judicial statements he has made which are inconsistent with his testimony on an issue relevant to the trial. *Smith v. State*, 273 Md. 152, 159, 328 A.2d 274 (1974). The appellant's reliance on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), as modifying that rule, is misplaced.

■ In *Doyle* the Supreme Court held that the defendants were denied due process at their state criminal trials when the prosecutor was permitted to cross-examine them on their trial testimony, providing an exculpatory version of the events in issue, on the basis that they had not told the officer who had arrested them the same story, but instead remained silent after receiving *Miranda* warnings. The Court reasoned:

> The warnings mandated by that case [*Miranda v. Arizona, supra*], as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker*, 417 U.S. 433, 443–444 [94 S.Ct. 2357, 2363, 41 L.Ed.2d 182] (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State

is required to advise the person arrested. See *United States v. Hale, supra,* at 177. [422 U.S. 171, 177, 45 L.Ed.2d 99, 105, 95 S.Ct. 2133, 2137 (1975)]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 617, 96 S.Ct. at 2244 (footnotes omitted). Doyle is inapposite to the case *sub judice* since the appellant, at the time of his arrest, did not remain silent after properly being advised of his *Miranda* rights. Instead, he attempted to exculpate himself by advising Corporal Russum that he had not had any contact with Middleton earlier that day. Having done so, his statements at that time were relevant to the credibility of the testimony he gave at trial proffering an inconsistent version of his involvement with the victim on January 5, 1985.

The Supreme Court made this distinction in *Anderson v. Charles* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). In that case Charles was convicted of murder at a state trial. He had been arrested for that crime while driving an automobile stolen from the victim. His possession of that stolen automobile and where he acquired it were significant circumstantial evidence of his criminal agency in the murder.

When Charles testified in his own defense he stated that he had stolen the automobile from "the parking lot of Kelly's Tire Company." During cross-examination the prosecutor was permitted to impeach that testimony with an inconsistent statement he gave the officer who arrested him. At that time, after he had been given his *Miranda* warnings, Charles advised the officer that he had stolen the automobile from a location two miles away from Kelly's

Tire Company. Comparing his trial testimony to his statement to the arresting officer, the prosecutor inquired:

Q. This is a rather recent fabrication of yours isn't [sic] it not?

A. No it isn't.

Q. Well, you told Detective LeVanseler back when you were first arrested, you stole the car back on Washtenaw and Hill Street?

A. Never spoke with Detective LeVanseler.

Q. Never did?

A. Right, except when Detective Hall and Price were there and then it was on tape.

The Supreme Court, holding that such cross-examination did not violate due process, explained:

In *Doyle*, we held that the Due Process Clause of the Fourteenth Amendment prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings. The case involved two defendants who made no postarrest statements about their involvement in the crime. Each testified at trial that he had been framed. On cross-examination, the prosecutor asked the defendants why they had not told the frameup story to the police upon arrest. We concluded that such impeachment was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. 426 U.S., at 618–619 [96 S.Ct. at 2245]; see *Jenkins v. Anderson, ante*, [447 U.S. 231] at 239–240 [100 S.Ct. 2124, 2129–30, 65 L.Ed.2d 86].

*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Mi-*

*randa* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. See *United States v. Agee,* 597 F.2d 350, 354–356 (CA3) (en banc), cert. denied, 442 U.S. 944 [99 S.Ct. 2889, 61 L.Ed.2d 315] (1979); *United States v. Mireles,* 570 F.2d 1287, 1291–1293 (CA5 1978); *United States v. Goldman,* 563 F.2d 501, 503–504 (CA1 1977), cert. denied, 434 U.S. 1067 [98 S.Ct. 1245, 55 L.Ed.2d 768] (1978).

447 U.S. at 407, 100 S.Ct. at 2181–82 (footnote omitted).

Since we have concluded that the cross-examination in the instant case was erroneously prohibited, there was no valid basis for the appellant's motion for mistrial. The appellant got more than he was entitled to.

## II. *Other Crimes Evidence*

 The appellant next contends that the court committed reversible error because it permitted a State's witness to testify that, either a year and a half or two years before Middleton was shot, he saw the appellant with a handgun in his possession. He argues that such evidence was not relevant for some other purpose than to show a probability that he committed the crime on trial because he was a man of criminal character. *Tichnell v. State,* 287 Md. 695, 711, 415 A.2d 830 (1980); *Waddell v. State,* 65 Md.App. 606, 609, 501 A.2d 865 (1985). We disagree. The evidence was probative to show that the appellant possessed the type of weapon employed in killing Middleton. The remoteness of that possession from the date of the homicide went to the weight of that evidence. The court did not abuse its discretion in determining that this evidence was relevant. *Brittingham v. State,* 63 Md.App. 164, 182, 492 A.2d 354 (1985).

## III. *Sufficiency of the Evidence*

Finally, the appellant asserts that the evidence was insufficient to sustain his convictions for second degree murder

and use of a handgun. He argues that the physical evidence was inconclusive as to the degree of culpable or non-culpable homicide and that the use of a deadly weapon was justified since his own life was threatened.

In reviewing the sufficiency of the evidence to support the convictions, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1972); *Tichnell v. State, supra.* In *Tichnell* the Court stated:

> To justify a homicide on the basis of self-defense (other than felony murder)
>
> "the accused must have had reasonable grounds to believe, and have in fact believed, himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant.... In Maryland it is for the trier of the facts to determine whether the accused was justified in meeting force with force. If justification be found to have existed, the force used must not have been 'unreasonable and excessive', that is, must not have been more force 'than the exigency reasonably demanded.'" *Guerriero v. State*, 213 Md. 545, 549, 132 A.2d 466 (1957) (citations omitted).

287 Md. at 718, 415 A.2d 830.

■ In the case *sub judice*, the jury could reasonably have concluded that the State had proven beyond a reasonable doubt the absence of circumstances justifying the appellant's killing of Middleton in self defense. *State v. Evans*, 278 Md. 197, 207–208, 362 A.2d 629 (1976). Likewise, there was ample evidence offered by the State to support the handgun convictions.

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY THE APPELLANT.